**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18-cr-00388 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| HUAZHI HAN ) | |

**MEMORANDUM OPINION AND ORDER**

On November 10, 2018, law enforcement officers arrested Defendant Huazhi Han and then searched his home, where they discovered incriminating evidence including firearms and approximately $1.29 million in cash. Han was subsequently charged in a four-count Superseding Indictment for his alleged role in a conspiracy to commit money laundering on behalf of an international drug-trafficking organization. With the present motion, Han seeks to have the evidence discovered during the search of his residence suppressed, arguing that the warrantless search violated his rights under the Fourth Amendment to the United States Constitution. The Government contends the search was lawful because the officers obtained consent to search Han's residence from both Han and his wife, who was home at the time of the search. For the reasons stated below, the Court is satisfied that consent was given by Han's wife and thus the motion to suppress (Dkt. No. 48) is denied.

**BACKGROUND**

The Court conducted an evidentiary hearing regarding Han's motion to suppress evidence, during which the Government called as witnesses the agents and officers who arrested Han and as well as those who subsequently searched his home. Those witnesses included Chicago Police Officers Jennifer Przybylo, Carlos Huertas, Elias Lacko, and George Karuntzos, and Drug Enforcement Administration Special Agents Thomas Asselborn and Daniel Gainer.

The Government also submitted into evidence various written reports and affidavits documenting Han's arrest and the search of his home. For his part, Han offered into evidence a video recording with audio from a security camera at his residence, depicting most (but notably not all) of the interaction between Han's wife, Jing Wang, and the officers who came to Han's house.[1] Wang also testified at the hearing on Han's behalf. The following summary of the evidence is based on the reports and affidavits, the partial video recording, and the testimony of the officers and Wang.

On November 10, 2017, law enforcement officers observed a meeting between a Confidential Source ("CS") and Han, at which the CS had arranged to provide Han with proceeds from illegal narcotics sales. After the CS gave the money to Han, Special Agent Asselborn and Officer Huertas arrested Han. According to the officers, Han told them that he did not speak English and began "screaming like a maniac" in Chinese. Special Agent Gainor and Officer Karuntzos, who were also present at the scene of Han's arrest, described him as "violently screaming" and "out of control." Special Agent Gainor and Officer Karuntzos began interrogating Han, whose demeanor suddenly became cooperative. According to the officers, Han calmed down and was "very, very, very comfortable" with the agents. He then voluntarily offered information about himself, his family, and various residential buildings that he owned, including his primary residence in Riverside, Illinois. According to the officers, he told them that his wife and child were likely at home, but the agents would not find any incriminating evidence there and could "feel free to go by the house, do what you want to do." Officer Karuntzos then

---

[1] The parties do not dispute that the version of the video the Government received from defense counsel already had gaps in it. Although it was suggested during the evidentiary hearing that the complete video might exist on a cloud server and that the Government would issue a subpoena to the third party that maintains the server, the full video, without gaps, has not been made part of record before the Court.

called Special Agent Asselborn, and together they decided to send officers to Han's primary residence and other residential properties he owned.

Special Agent Gainor, Officer Karuntzos, and Officer Huertas went to Han's primary residence. Other officers, includiung Special Agent Przybylo, were also dispatched to the residence in unmarked vehicles. Because the officers had reason to believe that Wang was at home, Officer Przybylo and Officer Huertas were sent to approach her and obtain her consent to search the house. According to their testimony, Officer Przybylo was selected because she is a woman and Officer Huertas because he is on the smaller side. All the officers who testified consistently stated that they would not have search the residence if Wang had not provided consent.

Officer Huertas and Officer Przybylo approached the front door of the house at approximately 3:30 p.m. The video recording recovered from Han's home-security system shows most of the sequence of events that followed. As shown on the video, Officer Huertas and Officer Przybylo knocked loudly and rapidly on the front door and rang the doorbell. Wang initially approached the door but did not open it. Officer Przybylo said through the door, "Hi, police, can you open the door?" Wang then opened the door. Officer Przybylo stepped through the doorway but remained by the door as she spoke to Wang. A few moments later, Officer Huertas similarly stepped into the home but remained by the door. Officer Huertas testified at the evidentiary hearing that he received oral consent from Wang before taking that step into the home, but the video recording does not depict any such exchange. Moreover, Officer Huertas testified that even if he had not received consent to enter the house, he would not hesitate to enter a doorway "if it was freezing outside."

3

The video recording further shows that the officers had the following exchange with Wang while standing in the entryway of the home:

Przybylo: We are the police. Are you Wang?

Wang: Yes.

Przybylo: Oh, okay. [The officer shows Wang a photo of Han.] Is this your husband? Is that your husband?

Wang: Yes, what happened?

Przybylo: Oh, okay.

Huertas: He's in custody right now.

Przybylo: Yeah, so he told us—

Huertas: He's locked up.

Przybylo: Yeah, we wanted to come and let you know, and he told us that we could take a look in the house to make sure there's nothing in here. Are you—

Wang: He's what?

Huertas: He's in jail.

Wang: Jail? Why, what happened?

Przybylo: He's okay, he's okay, it's okay.

At this point, there is a 24-second gap in the video recording. Neither Han nor the Government was able to explain the gap in the video, and neither had a complete version of it. According to Officer Przybylo, the missing video footage would have depicted her explaining to Wang that Han was in custody at the Summit Police Department, that he was arrested with a gun and a large amount of money, and that he was okay. Officer Przybylo also testified that she asked Wang about the composition of the family and learned that Han and Wang's infant child was also present in the home.

4

The next portion of video footage, after the gap, shows Officer Przybylo explaining that the officers needed to make sure that there were no more guns[2] in the home, which could be "very dangerous for the baby." Officer Huertas then asks Wang, "Do you want to grab the baby?" Wang responds, "No, he's sleeping." Officer Huertas next informs Wang that there are other officers there and asks whether this is the only residence Han owns. This exchange is followed by another gap in the recording, approximately two minutes in length. Officer Przybylo testified at the evidentiary hearing that the missing footage would have shown her asking for and receiving verbal consent from Wang to search the home. Officer Przybylo claims she asked Wang "if it was okay that we came in to take a look," and Wang replied, "yeah, there's nothing here, you can come in." Officer Huertas also testified that Wang gave consent for the officers to search the home either during this gap in the recording or the prior one; he could not specifically recall when.

After the second gap in the recording, Wang can be seen telling Officer Przybylo that her "English is not very well [*sic*]," and Officer Przybylo responds, "That's okay." Wang then adds, "My job is just to become a housewife [*sic*]," and she further states that she has two children. As they converse with each other, Officer Przybylo can be seen shining a flashlight in Wang's direction, illuminating the living room behind her.

Officer Huertas then asks, "Are there any other adults in here?" and moves past Wang into the living room. Officer Przybylo responds, "No, there's just a baby sleeping upstairs." Officer Huertas turns around and says to Wang, "Show me where the room is at. Your room. Where he sleeps. Where does he sleep?" Wang answers, "Upstairs." During this conversation,

---

[2] Wang testified that Officer Przybylo said there could be **bombs** in the home. However, the Court's review of the video recording indicates that Wang likely misheard Przybylo, who seems actually to have used the word "guns" not "bombs."

5

three other male officers had follow Officer Huertas into the living room. Officer Huertas then says to Wang, "Can you show them? Can you show these officers?" Officer Przybylo adds, "Yeah, show us where he sleeps, okay? We want to make sure there's no more guns there." Officer Huertas, Officer Przybylo, Wang, and the three other officers then walk through the living room and out of view of the camera, presumably to continue the search.

Approximately half an hour into the search, Officer Przybylo tells Wang, "I'm going to need you to sign this paper," and hands her a written consent form. Wang complies. Officer Przybylo does not appear from the video recording to explain the consent form to Wang or give her a chance to read it before requesting her signature. Officer Przybylo testified, however, that she provided an explanation to Wang after handing the form to her and that Wang in fact read the form before signing it. According to Officer Przybylo, the written consent served merely to memorialize the verbal consent that Wang already provided. For her part, Wang testified that she immediately signed the form as instructed by Officer Przybylo—without any explanation and without reading it—because she felt that she was "not in any position to refuse."

According to the hearing testimony, at some point, Wang also asked Officer Przybylo and Special Agent Yusuf Norris about her father, who was with Han when he was arrested. Wang mentioned concerns about her father's physical health, as he needed daily medication to treat his diabetes. Officer Przybylo testified that the officers reassured Wang that her father was safe. But Wang testified that the agents told her that her father had also been arrested and put into jail.

Later, while the search was still underway at around 5:15 p.m., Special Agent Norris informed Wang that her vehicle would be seized in connection with the investigation. Wang refused, telling the officers that the car was her private property and explaining that she had to

pick up her older son from school. Special Agent Gainer told Wang that she could pick up her son, but she would have to be accompanied by Officer Przybylo and would be followed by other officers in a separate car. Wang was further informed that upon her return the car would be taken. Wang agreed. Officer Przybylo then accompanied Wang to pick up her son from school, with Special Agent Gainer following behind. Wang requested that when they picked up her son from school, Officer Przybylo pretend to be an old college friend to avoid alarming her son. Officer Przybylo did as Wang asked.

      According to the officers, the search of Han's home was peaceful and organized. Furthermore, the officers claim that before they left, they thanked Wang for her cooperation. Wang, on the other hand, testified that she was terrified and the agents ransacked her home and rifled through her belongings. When asked at the evidentiary hearing why she did not object to the search or attempt to stop the officers, Wang testified that she did not feel she could do so. By way of example, Wang went on to describe one specific incident when the officers discovered a cosmetic bag containing cash amongst her belongings. Wang described how she attempted to prevent the agents from confiscating the cash, explaining that it was her private spending money for special occasions such as New Year's celebrations, birthdays, and wedding anniversaries. According to Wang, the agents ignored her objections and seized the money anyway.

      During their search of Han and Wang's home, the officers recovered several items including a money counter, rubber bands, firearms, and approximately $1.29 million found behind a dropped ceiling in the basement. Han asks this Court to suppress all the evidence obtained through the search.

**DISCUSSION**

The Court starts from a presumption that warrantless searches within a home are unreasonable and violate the Fourth Amendment. *United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014) (citing *Payton v. New York*, 445 U.S. 573, 576 (1980)). However, such searches are constitutionally permissible if an authorized individual voluntarily consents. *Id.*; *see also United States v. Duran*, 957 F.2d 499, 501–02 (7th Cir. 1992). Whether an individual's consent to a search was voluntary is a factual determination for the court to make. *Richards*, 741 F.3d at 847. "The government must prove 'by a preponderance of evidence that consent was freely and voluntarily given.'" *Id.* (quoting *United States v. Grap*, 403 F.3d 439, 445 (7th Cir. 2005)).

### I. Han's Consent

The Court first considers whether the Government has established that Han provided his consent to search the residence. The Government presented testimony from Agent Gainer and Officer Huertas, both of whom claimed that Han gave oral consent for them to search his home. The Government suggests that because Han exercised his right not to testify at the evidentiary hearing, the Court must accept Agent Gainer's and Officer Huertas's testimony that Han consented. But the Government has the burden of proving consent. And here, Agent Gainer's and Officer Huertas's testimony is called into question by the lack of written documentation corroborating their claim.

While the officers testified that they took the additional step of documenting Wang's oral consent by asking her to sign a consent form, they took no such measures with Han. Moreover, Special Agent Asselborn authored a report dated November 13, 2017, in which he described Han's arrest and the search of his residence. The report contains no reference to Han's supposed oral consent. Similarly, Special Agent Timothy Jennings submitted a search warrant affidavit

8

that describes Han's arrest and interrogation. The report documents that officers read Han his *Miranda* rights,[3] Han invoked his right to an attorney, and Han indicated that he could not speak English, but it does not mention any oral consent provided by Han. While the Government attempts to explain this lack of corroboration in the contemporaneous documentation by claiming that the affidavit was submitted for the limited purpose of securing a search warrant for certain phones and a computer, those items were obtained during the allegedly consensual search of Han's residence. Given how thorough Special Agent Jennings was in describing Han's arrest and interrogation, the Court finds it odd that he would have omitted Han's express consent to search his home.

Furthermore, during the evidentiary hearing, Han presented video footage of Special Agent Gainer in Han's garage speaking on the phone to a colleague, who Special Agent Gainer identified as Special Agent Dan Wood. Special Agent Gainer admitted during his testimony that the video depicts him telling Special Agent Wood that Wang was "dead" for signing the consent form. Special Agent Gainer testified that he meant that Wang would be "in trouble" for providing consent—either with Han or with other members of his "larger criminal organization." The Court finds it unlikely that Special Agent Gainer would make such a statement if he had indeed already obtained Han's consent to search the residence as claimed.

Thus, in consideration of the full record and notwithstanding the testimony of the law enforcement officers, the Court concludes that the Government has not established by a preponderance of the evidence that Han gave consent for the search of his residence.

---

[3] This, of course, is a reference to the requirement that law enforcement officers advise a criminal suspect of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966).

## II. Wang's Consent

Because it has failed to establish that Han consented to the search, the Government can only justify the officers' warrantless search by showing that Wang consented.[4] *See Fernandez v. California*, 571 U.S. 292, 302–03 (2014) (holding that police could search the defendant's apartment after obtaining the consent of a woman who lived with him, even though the defendant had objected to the search before his arrest); *United States v. Henderson*, 536 F.3d 776, 785 (7th Cir. 2008) ("Both presence *and* objection by the tenant are required to render a consent search unreasonable as to him."). The parties do not dispute that Wang, Han's wife and a co-resident of the home, had authority to consent to a search of the premises—a conclusion supported by ample Seventh Circuit precedent. *See, e.g.*, *United States v. Groves*, 530 F.3d 506, 510 (7th Cir. 2008) (holding that the defendant's girlfriend, a "co-occupant of [the defendant's] apartment who possessed common authority over the residence," had actual authority and ability to consent to a search by law enforcement (internal quotation marks omitted)); *United States v. Robinson*, 479 F.2d 300, 302 (7th Cir. 1973) ("A defendant's paramour may give valid consent to the search of premises they jointly occupy."). Wang, however, vehemently denies consenting to the search.

In support of its position, the Government has offered the testimony of Officer Przybylo and Officer Huertas, both of whom claim that Wang gave consent. The testimony of the other officers supports their version of events. For example, Officer Lacko, who was also sent to search Han's residence, testified that he was instructed to wait in his vehicle for confirmation of Wang's consent. Officer Karuntzos testified that Officer Przybylo and Officer Huertas gave a

---

[4] Even if Han consented, Wang's refusal to consent would have rendered the subsequent search unconstitutional. *See Georgia v. Randoph*, 547 U.S. 103, 114 (2006) ("Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all.").

10

"little wave" to indicate to him and the other officers waiting outside the residence that Wang had given consent.

While the video footage does not show Wang either giving or refusing consent, there are two unexplained gaps in the recording. The video was recorded by Han's home-security camera and provided to the Government by Han's counsel. Every indication in the record supports the conclusion that the gaps were present in the recording when the footage was provided by Han to the Government. It may be nothing more than an unfortunate coincidence that the verbal exchange between the officers and Wang regarding consent to search the home occurred during one of the gaps in the video footage. But if an inference were to be drawn that someone altered the tape, only the defense (and not the Government) had the opportunity to do so. Therefore, even though the video does not show Wang providing consent, given the circumstances, the Court cannot conclude that its omission from the video indicates that Wang did not consent.

Notably, the remaining video footage appears consistent with Officer Przybylo's and Officer Huertas's testimony. The video depicts Wang initially standing in between the living room and the officers, as if blocking them from the rest of the home. Then, after the point in their conversation when the officers claim they obtained Wang's consent, she moves out of their path and follows them as they enter the living room and walk towards the back of the residence. Wang does not appear agitated or distressed as the officers make their entry. Those movements are consistent with Wang granting consent for the officers to enter and search the residence as described by the Government's witnesses. Based on the testimony and video footage, the Court thus concludes that the Government has met its burden of showing by a preponderance of the evidence that Wang orally consented to the search.

11

Han argues in the alternative that even if Wang gave consent to Officer Przybylo and Officer Huertas, that consent was the product of coercion and therefore involuntary. "Whether a third-party's consent is voluntarily given to the police is a question of fact that depends on the totality of the circumstances." *Richards*, 741 F.3d at 848 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). In determining whether consent was given voluntarily, the Court must consider the following factors: (1) the giver's age, education, and intelligence; (2) whether the giver was informed of her constitutional rights; (3) whether the giver was in custody; (4) how long she was detained; (5) whether the giver consented immediately or after police made several requests; and (6) whether the police used physical coercion. *Id.*; *see also United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000). These factors are viewed in light of the "objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given." *Grap*, 403 F.3d at 445.

Applying the factors to present case, the Court notes that Wang is a 40-year-old, college-educated woman. She was not informed of her constitutional right to refuse consent. But she also was not in custody nor was she detained at any point. She appears to have consented immediately upon the officers' request. No physical coercion was involved, and the officers did not raise their voices at her. While Wang is a petite woman, based on the available video footage and witness testimony, she was comparable in stature to Officer Przybylo, and at no point did Officer Huertas hover over her or physically intimidate her.

Han contends that Wang's consent could not have been voluntary for several reasons. First, he points out that Officer Przybylo and Officer Huertas stepped into the entryway of the home almost as soon as Wang opened the door, prior to seeking her consent. According to Han, the officers committed a Fourth Amendment violation by doing so and cannot rely upon Wang's

12

later-provided consent to excuse their conduct. The Court is unpersuaded by Han's line-drawing, however, as "[w]here the home begins is not a point immediately obvious." *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 689 (7th Cir. 2001) (refusing to recognize "a firm line at the entrance to the house" (internal quotation marks omitted)). Moreover, consent may be manifested in a nonverbal manner, such as "opening the door and stepping back to allow entry," *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000), or "subsequent silence and apparent acquiescence" after an officer enters a doorway, *Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988) (holding that it is reasonable for a law enforcement officer to assume consent if the party does not "verbally object," "act astonished," or "physically respond in any way that might relay the message she disapproved" of the officer's entrance). At the evidentiary hearing, Officer Przybylo and Officer Huertas testified that they stepped into the doorway in part to seek warmth, as it was very cold outside. That testimony is supported by the video footage, which depicts the officers dressed in thick coats and knit hats. Thus, the Court is not persuaded that Officer Przybylo and Officer Huertas violated the Fourth Amendment by merely stepping over the threshold of the front door and standing next to Wang in the entryway.

Han also argues that Wang only consented to the search after Officer Przybylo falsely informed Wang that her husband had already given his consent. Although a police officer's failure to inform someone that she can refuse consent to search is a factor to consider in determining if the consent was voluntary, the absence of such a disclosure does not automatically render the consent involuntary. *Schneckloth*, 412 U.S. at 227 (holding that consent need only be free from coercion, it need not be given with awareness of the constitutional right being surrendered). Instead, the Court's analysis remains centered on the individual's "ability to assess whether or not [s]he could refuse the search." *United States v. Nafzger*, 965 F.2d 213, 216 (7th

13

Cir. 1992) (holding that an individual reasonably felt he could not refuse after police confronted him with a defective warrant); *see also United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009) (holding that even though police "arguably implied that they had a right to search [his] apartment without permission" because it was condemned, the totality of the circumstances indicated that the individual gave voluntary consent). "The usual case in which consent to enter and/or search is deemed *in* voluntary [*sic*] involves factors . . . such as (1) lack of mental capacity, (2) inability to understand English, (3) physical force or threats, (4) the display of weapons, or (5) repeated or lengthy questioning." *United States v. Jerez*, 108 F.3d 684, 720 (7th Cir. 1997) (Coffey, J., dissenting).

Although Wang testified that her English proficiency is limited, she earned her college degree from a university in the United States. She also managed to communicate effectively with the officers regarding several topics on the date of the search. For example, Wang inquired into her father's health and specifically expressed concerns about his condition as a diabetic. In addition, she convinced Officer Przybylo to pretend to be a college friend to avoid frightening her son. In sum, based on the totality of the record, the Court finds that Wang sufficiently understood English such that she could provide voluntary consent. Moreover, while Wang testified that she felt fearful because the officers were armed with guns, she admitted that the guns remained holstered at all times. Wang was not subject to any physical force or threats, nor was she subjected to repeated or lengthy questioning. As captured on the partial video, the exchange between Wang and the officers appeared calm, controlled, and of relatively short duration.

Han further claims that Officer Przybylo attempted to scare Wang into consenting by claiming that guns in the residence posed a danger to her infant child. But the Court is not

14

persuaded. The Seventh Circuit has held that even a forceful entry and protective sweep by the police does not necessarily vitiate an individual's ability freely to consent. *See United States v. Contreras*, 820 F.3d 255, 270 (7th Cir. 2016); *see also United States v. LaGrone*, 43 F.3d 332, 333–34 (7th Cir. 1994) (finding that a nineteen-year-old voluntarily consented to a search even after officers wearing raid masks entered with weapons drawn and held the defendant in custody for 15 minutes prior to obtaining consent). Finally, and significantly, the Court observes that despite her testimony that she was afraid to refuse the officers, Wang appears to have pushed back regarding certain aspects of their search of the home. For example, when asked by Officer Huertas if she wanted to bring her baby downstairs, Wang declined, explaining that she did not wish to interrupt the baby's nap. Wang also protested the officers' seizure of her car and the cash in her cosmetic bag. During her testimony, Wang failed to explain convincingly why she would have been too afraid to tell Officer Przybylo and Officer Huertas that they could not enter the home yet felt confident enough to object to the officers' actions on multiple occasions.

Having considered all the objective facts, the Court finds that the government has satisfied its burden of establishing that Wang's consent was voluntary. Therefore, the warrantless search of Han's house did not violate the Fourth Amendment and it is not necessary to suppress evidence recover during that search.

## CONCLUSION

For the reasons given above, Han's motion to suppress (Dkt. No. 48) is denied.

ENTERED:

Dated: September 23, 2020          _____
                                   Andrea R. Wood
                                   United States District Judge