**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-00388 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| HUAZHI HAN | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant Huazhi Han was charged for his role in a conspiracy to engage in money laundering for the benefit of an international drug-trafficking organization. The four-count Second Superseding Indictment (Dkt. No. 174) charged Han with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count I); money laundering by concealment, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count II); conducting a financial transaction represented to involve proceeds from unlawful activity, in violation of 18 U.S.C. § 1956(a)(3)(B) (Count III); and operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) (Count IV). Han went to trial, and the jury ultimately returned a verdict finding Han guilty as to each of the four charged counts. Now before the Court are Han's post-trial motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (Dkt. No. 234) and for a new trial pursuant to Federal Rule of Criminal Procedure 33 (Dkt. No. 235). For the reasons that follow, both motions are denied.

**BACKGROUND**

The Second Superseding Indictment alleged that Han conspired to knowingly conduct and attempt to conduct financial transactions involving the proceeds of an unlawful activity—namely, narcotics trafficking—knowing that the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the unlawful activity. In

particular, Han was alleged to have worked on behalf of a Mexico-based money laundering organization ("MLO") by collecting large amounts of narcotics proceeds, knowing those funds to be the proceeds of some form of unlawful activity. He used the narcotics proceeds to purchase electronic goods that he would then sell to others, thereby concealing and disguising the nature, location, source, ownership, and control of those proceeds. Finally, Han would wire transfer the proceeds from his sale of the electronic goods to various bank accounts, as directed by another member of the MLO.

A jury trial commenced on March 10, 2022. At trial, the jury heard testimony regarding the events leading up to and culminating in Han's arrest. The evidence at trial is summarized as follows. On November 9, 2017, agents with the Drug Enforcement Administration ("DEA") arrested Rafiq Roman and seized approximately $150,000 that Roman acknowledged was derived from his sale of cocaine. That same evening, Roman agreed to cooperate with law enforcement. Thus, in the DEA agents' presence, Roman contacted the source of his drugs, a Mexico-based individual known to Roman as "Tio," who used a phone number with a Mexican country code. Tio provided Roman with a telephone number for an individual Tio identified as "Sam" and a serial number from a dollar bill that Roman would provide to Sam when dropping off the drug proceeds. While still in the DEA agents' presence, Roman called the telephone number provided by Tio and arranged a money transfer for the next day.

Prior to the money transfer, DEA agents provided Roman with lookalike currency to use in the transaction. On November 10, 2017, Han met with Roman in a grocery store parking lot that was being surveilled by DEA agents and other law enforcement officers and accepted a bag filled with lookalike currency. Shortly thereafter, DEA agents approached Han in his parked vehicle and recovered from that vehicle a loaded firearm, about $200,000 in cash, and the

lookalike currency Han had received from Roman. After arresting Han, law enforcement officers went to Han's residence and, upon receiving consent from Han's wife, conducted a search. During their search, the officers discovered about $1.3 million in cash in cookie tins stored in the basement's drop-ceiling and vacuum-sealed bags in the basement's closet. Officers also recovered from Han's residence a large quantity of rubber bands and ledgers and three firearms. Because the DEA's investigation was ongoing, Han was released the next day without being charged.

Several months later, in June 2018, law enforcement officers arrested Jason Mei in the course of a money laundering investigation. At the time of his arrest, Mei possessed large quantities of marijuana and cash. Mei subsequently agreed to cooperate with the investigation. On June 4, 2018, Mei met with Han to redeliver the cash previously seized by law enforcement. After the meeting concluded, law enforcement officers followed Han until he parked his car. As he walked away from his vehicle, officers approached Han and arrested him. They then searched Han's vehicle, where they found in the trunk a bag containing the money given to him by Mei. Sometime after Han had waived his *Miranda* rights, he made the following statements: "I'm fucked, I'm fucked. I'm screwed. Just kill me now" and "I'm so screwed. It's over."

On June 25, 2018, DEA agents and other law enforcement officers arrived at Han's home to effectuate an arrest warrant. When Han saw the officers, he ran into his house and locked the door. The officers knocked on Han's door for approximately three minutes and announced they had a warrant for his arrest. Eventually, the officers forced their way into the residence. At that point, Han ran further inside the house and was later found in a bedroom where he was placed under arrest. Law enforcement officers then searched Han's residence and found approximately $45,000 in cash underneath the insert of a kitchen garbage can and in clothing, as well as rubber bands and multiple cellular phones.

During trial, the jury heard testimony from multiple law enforcement officers. Further, both Roman and Mei testified about their dealings with Han. Other evidence introduced by the Government included Han's phone records and electronic communications, along with other recordings of communications involving Han. The Government also introduced Han's personal income tax returns for the years 2012 through 2016 and records reflecting Han's wife's purchase of a $62,000 Mercedes in 2016. At the close of the Government's evidence, Han moved for a judgment of acquittal pursuant to Rule 29 and for a mistrial. The Court deferred ruling on the Rule 29 motion and denied Han's motion for a mistrial. The jury ultimately found Han guilty on all four counts of the Second Superseding Indictment and later returned a special verdict regarding forfeiture. Following the verdict, Han renewed his motion for a mistrial, which the Court again denied.

## DISCUSSION

Han contends that he is entitled to a judgment of acquittal because the Government's evidence was insufficient to prove his guilt beyond a reasonable doubt. Alternatively, he argues that numerous errors during his trial require that the jury's verdict be vacated and a new trial be ordered. The Court will first consider the sufficiency of the evidence before turning to consider whether there were errors that necessitate a new trial.

### I.    Motion for a Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, where "the evidence presented at trial is insufficient to support a conviction, a district court must enter judgment of acquittal either after the government has closed its evidence or after a jury has rendered a verdict or been discharged." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019) (internal quotation marks omitted). In reviewing a motion for judgment of acquittal, the district court must "view the evidence in the

4

light most favorable to the government and draw all reasonable inferences in the government's favor." *Id.* (internal quotation marks omitted). Furthermore, "any challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable burden" and courts will "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted). Where, as here, a defendant moves for a judgment of acquittal at the close of the Government's case and the court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

### A.    Count I

Count I of the Second Superseding Indictment charged Han with participating in a conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), beginning no later than July 2017 and continuing through at least June 2018. To prove a money laundering conspiracy, the Government must establish "that the defendant knowingly was involved with at least one other person who has agreed with him to commit an act of money laundering, and that the defendant knew the proceeds used to further the scheme were derived from illegal activity." *United States v. Castro-Aguirre*, 983 F.3d 927, 940–41 (7th Cir. 2020) (internal quotation marks and citation omitted). Proof of the substantive offense of money laundering requires evidence from which a rational trier of fact could conclude "that the defendant knowingly used the proceeds from a specified unlawful activity in financial transactions that . . . were designed to conceal or disguise the proceeds of the unlawful activity." *Id.* at 941 (alteration in original) (internal quotation marks omitted). In this case, Han argues that the evidence did not show that he conspired with either Roman or Mei to launder money. Further, to the extent the evidence did establish that Han conspired with both Roman and Mei, Han asserts that his conviction

nonetheless cannot stand due to a fatal variance between the evidence of multiple conspiracies and the single conspiracy charged in Count I.

i.      *Conspiracy with Roman*

According to Han, no reasonable jury could find that he and Roman conspired to launder money. First, Han claims that there was no evidence demonstrating that he knew that the funds he collected from Roman were proceeds of an illegal activity. In evaluating the evidence of Han's knowledge, the pertinent question is not whether Han "knew the ***actual*** source of the funds, merely whether he knew they were the proceeds of ***some*** illegal activity." *United States v. Turner*, 400 F.3d 491, 497 (7th Cir. 2005). Such "[k]nowledge may be inferred from circumstantial evidence." *Id.*

While Han correctly notes that the jury heard no evidence that Roman directly told him that the money being exchanged was narcotics proceeds, there was ample evidence from which a jury could infer that Han knew the money was the proceeds of some illegal activity. The jury heard Roman testify that he sold cocaine and then met with Han on eight or nine occasions to hand off the proceeds of his drug dealing. And Roman stated that his source for cocaine, Tio, was the one who put him in touch with Han. Tio also provided Roman with a serial number associated with a dollar bill, and each time Roman met with Han, Han provided Roman with the dollar bill bearing that serial number. That Tio could provide Roman with Han's phone number and a specific serial number matching a dollar in Han's possession undoubtedly shows a connection between Roman's cocaine supplier and Han.

Further, evidence that Han recognized that his transactions with Roman had to occur in secret was probative of his knowledge of the nature of the funds he was collecting. For example, prior to one meeting with Roman, Han switched the meeting location at the last minute because

there were too many people around the original meeting place. There were also several communications between Han and Roman where Han expressed wariness of potential police presence when selecting meeting locations. Finally, the jury could reasonably infer that Han knew that a person who was otherwise a stranger to him would not simply hand over to him $100,000 in cash if that money was not dirty.

Han also contends that there was no proof he engaged in any transaction designed to conceal or disguise the money he received from Roman. But Roman testified that he met with Han at Tio's direction and for the purpose of getting the money back to Mexico undetected. Roman's transactions with Han involved large sums of cash and were shrouded in secrecy, as Roman and Han used code names, met in isolated places, and identified each other by way of the serial number system. Such "transactions surrounded in unusual secrecy" are "indicative of a design to conceal." *Turner*, 400 F.3d at 497; *see also United States v. Cedeno-Perez*, 579 F.3d 54, 61 (1st Cir. 2009) (finding that the defendant carried out a financial transaction with a design to conceal where he "employed code words to identify callers and to establish a meeting location free of police presence[,] packaged the money in a bag, kept the bag in his trunk, and delivered it in a mall parking lot"). Moreover, Roman testified that he was fronted the cocaine he sold and paid for it from the proceeds of his sales of the fronted drugs. Thus, the jury could reasonably infer that Roman knew that his transactions with Han successfully transmitted his drug proceeds back to his suppliers in Mexico since he continued to receive fronted deliveries of cocaine.

In sum, there was sufficient evidence from which the jury could conclude that there was an agreement between Han and Roman to launder money. Further, the evidence supports the jury's conclusion that Han knew that the money he received from Roman was derived from some

illegal activity. The jury therefore could reasonably conclude that Han and Roman were part of a money laundering conspiracy.

ii.    *Conspiracy with Mei*

Next, Han challenges the sufficiency of the evidence showing that he conspired with Mei. Again, Han claims that there was no evidence establishing that he knew that the money he received from Mei was narcotics proceeds. Yet Mei himself testified that he picked up the money from various individuals in Chicago at the behest of someone named "Sasa," who explicitly informed Mei that he was collecting proceeds of Mexico-supplied narcotics. Mei's job was to ensure that the money was transferred to China. To make those transfers, Mei turned to Han, who Mei found using the messaging app WeChat. Mei testified that he met with Han about ten times to drop off what was usually between $100,000 and $200,000 in cash to be transferred to China.

Han's interactions with Mei gave the jury ample basis from which to conclude that Han knew that the money he received from Mei came from unlawful activity. In particular, Mei had planned to make a cash delivery to Han on June 1, 2018, but Mei missed that meeting after he had the encounter with law enforcement that ended with him agreeing to cooperate with their investigation. Subsequently, Han made repeated calls and electronic communications to Mei in which Han angrily demanded that Mei meet with him. Han threatened Mei, claiming that someone would come to find him. And while Mei had never told Han any personal details about himself, Han somehow knew Mei's birth year and that he had a girlfriend and two children. The jury also saw footage from Mei's home security camera showing Han outside of Mei's home, even though Mei had never given Han his address. During this time frame, Han made phone calls to someone known as "Kayla Li" that evidenced Han's attempts to get information regarding Mei.

8

When Han and Mei finally met on June 4, 2018, Mei claimed to be a drug dealer and explained that he had been laying low after law enforcement had seized 1,000 pounds of his marijuana. In response, Han said that Mei should have told him earlier because he had a lot of friends "who do this" and seizures were "very normal" so he could "understand this matter," noting that "we deal with the feds frequently." Nonetheless, Han acknowledged that "since we decided to do this [sic] kind of things, then we will need to bear some risks because this is something we can do nothing about." Similar to his meetings with Roman, Han insisted that he and Mei find an inconspicuous location where Mei could hand off the money to Han, as the thing Han said he feared most was being followed. Taken together, Han's "shady" acts and statements to Mei are more than enough for a jury to reasonably conclude that Han knew that he was dealing with "ill-gotten" funds. *Turner*, 400 F.3d at 497–98. And Mei expressly told Han that he dealt marijuana, such that the jury could believe that Han must have known that the large amounts of cash Mei gave him were the proceeds of his dealing. *See United States v. McBride*, 724 F.3d 754, 757 (7th Cir. 2013) (explaining that the trier of fact could find that the defendant's girlfriend must have known that she was laundering the proceeds of a crime given that "[s]he knew the defendant was a drug dealer" and knew that most of the money was not coming from the clothing store the defendant operated as a front for his drug dealings).

Given the similar circumstances in which Mei handed off the money to Han, the jury had sufficient evidence from which to conclude that the two engaged in transactions designed to conceal the nature of the funds. Mei further testified that, after each of their transactions, Han would provide Mei with a receipt proving that the cash had been successfully transferred to a specified bank account in China. Thus, the jury had ample evidence supporting its determination that Han and Mei were involved in a money laundering conspiracy.

###### iii.      *Single Conspiracy*

Finally, Han argues that while the Second Superseding Indictment charges him with being involved in a single conspiracy, the Government's evidence at trial did not connect Han's interactions with Roman and Mei. For that reason, Han asserts that there is a fatal variance between the conspiracy charged and the Government's proof. Such a "conspiracy variance" claim constitutes an attack on the sufficiency of the evidence supporting the conspiracy conviction. *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). However, "even if the evidence arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *Id.* (internal quotation marks omitted).

To be a conspirator, a defendant must know of the agreement and must intend to join it. *Id.* at 1390. Because the "crime of conspiracy focuses on agreements, not groups," the Government is not required "to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group." *Id.* at 1389. Consequently, "any failure to identify the connection between [a defendant's] co-conspirators [does] not amount to a material variance." *United States v. Hopper*, 934 F.3d 740, 759 (7th Cir. 2019). Moreover, a criminal conspiracy may be supported entirely by circumstantial evidence, so long as there is enough such evidence "to support, beyond reasonable doubt, an ***inference***" of the purported agreement. *Townsend*, 924 F.2d at 1390.

The Court finds that the record here was sufficient for the jury to find beyond a reasonable doubt that Han's dealings with Roman and Mei were done in his capacity as a participant in a single conspiracy to launder the proceeds generated by Chicago-based drug dealers back to

Mexico-based suppliers. Certainly, the jury was not required to consider Han's relationships with Roman and Mei in isolation. The evidence showed that Han directly picked up the funds from Roman, a drug dealer, and identified him by way of the dollar bill serial number system. While there was not evidence before the jury of what Han did with Roman's money after the pickup, the jury learned that the money successfully made it to Mexico. On the other hand, Mei was the person who interacted directly with the drug dealers, again using the serial number system, and Han's role was to start the process of transferring the drug dealers' funds to accounts outside of the United States. Han's actions varied somewhat with respect to his dealings with Roman and Mei, but viewing those actions altogether, the jury could have discerned that Han was the common connection between the movement of drug money collected in the Chicago area out of the United States. From that, the jury could infer that Han acted with a "common purpose" as to both Roman and Mei. *See United States v. Shorter*, 54 F.3d 1248, 1254 (7th Cir. 1995) ("If the defendants joined together to further one common design or purpose, a single conspiracy exists." (internal quotation marks omitted)).

Moreover, the jury heard other evidence tending to show that Han's conduct was part of a larger, connected enterprise. The jury learned that Han's phone and messaging records from the relevant time frame reflected numerous communications between Han and Mexico-based phone numbers, and included contacts occurring shortly before and after Han's meetings with Roman and Mei. On one occasion, both Han and Roman spoke over the phone about a transaction with a person calling from a Mexico-based phone number. The jury also saw Han's communications with a person using a Mexico-based phone number in which Han and a man identifying himself as "Jim" discussed wire transfers into Chinese bank accounts. In certain of Han's communications, he appeared to arrange meetings with unidentified strangers in various parking lots and exchanged

an alphanumeric code consistent with a dollar bill serial number. On multiple occasions, Han made references to "the boss." He also explained to Mei that "for people like us who have been around doing these things, there is nothing I haven't seen." Such evidence further reinforces that the jury had a basis to find that Han was involved in a single conspiracy.

Even if there was a variance between the Government's proof at trial and the Second Superseding Indictment, such a variance would be fatal only if Han could demonstrate prejudice. *United States v. Curtis*, 37 F.3d 301, 305 (7th Cir. 1994). But here, any variance would be harmless because the evidence would still show that Han was a member of both a conspiracy with Roman and a conspiracy with Mei. *E.g.*, *United States v. Bruun*, 809 F.2d 397, 406 (7th Cir. 1987) ("While the charging of one conspiracy where the evidence shows multiple conspiracies is error, the error is harmless where the defendant is shown to have been a member of each of the allegedly separate conspiracies." (citation omitted)). As discussed above, the Court is satisfied that there is no variance here; but if there were a variance, it would not require acquitting Han of the conspiracy charge. Accordingly, the Court denies Han's request for a judgment of acquittal as to Count I.

### B.   Count II

In Count II, Han was charged with a violation of 18 U.S.C. § 1956(a)(1)(B)(i), arising out of his November 10, 2017 meeting with Roman. A conviction under § 1956(a)(1)(B)(i) requires the Government to "prove that the defendant conducted a financial transaction knowing that the property involved in the transaction was illegally derived and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." *United States v. Esterman*, 324 F.3d 565, 569 (7th Cir. 2003). The Government proceeded on an attempt theory as to this charge, and therefore the

Government was required to establish that Han "acted with the specific intent to conduct the financial transaction described in the substantive statute, and that he took a substantial step toward completion of the transaction." *United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000).

The Court has already discussed generally how the evidence showed that Han's meetings with Roman involved financial transactions designed to conceal or disguise drug proceeds and that Han knew that the proceeds were derived from some form of unlawful activity. That analysis also explains why the jury had evidence to conclude that, on November 10, 2017, Han met with Roman intending to complete a transaction that violated § 1956(a)(1)(B)(i). Nonetheless, emphasizing § 1956(a)(1)'s language requiring that the financial transaction "***in fact*** involve[] the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1) (emphasis added), Han argues that no violation of the statute occurred during that meeting because the transaction involved lookalike currency rather than the actual proceeds generated by Roman's drug sales. The lookalike currency, of course, was substituted by law enforcement officers to stand in for the narcotics proceeds seized from Roman. And, for purposes of attempted money laundering, what matters is that, had law enforcement not intervened and the transaction proceeded with Roman's true proceeds, Han would have committed the crime. *See United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010) ("[A] substantial step must be something that makes it reasonably clear that had the defendant not been interrupted or made a mistake he would have completed the crime." (internal quotation marks omitted)). "It is no defense that, unbeknownst to [Han], completion of the illegal plan was impossible." *Barnes*, 230 F.3d at 315. Therefore, Han's conviction as to Count II stands.

### C. Count III

Count III charged Han in relation to his June 4, 2018 transaction with Mei. That transaction was alleged to have violated 18 U.S.C. § 1956(a)(3)(B), which governs money laundering transactions in connection with a "government undercover operation" or "sting." *United States v. Stratievsky*, 430 F. Supp. 2d 819, 823 (N.D. Ill. 2006). The statute makes unlawful a financial transaction intended "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity" and involving "property ***represented*** to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3)(B) (emphasis added). The statute goes on to define "represented" to mean "any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section." *Id.*

Han argues that there was insufficient evidence to convict him on Count III because Mei testified that law enforcement never directed him to make any representation regarding the nature of the proceeds. It is true that Mei testified that on June 4, 2018, he pretended to be a drug dealer on his own accord and not at the direction of law enforcement. Yet Mei's testimony was contradicted by the testimony of one of the agents involved in the undercover operation who stated that he instructed Mei to tell Han that the cash was from drugs. Faced with two different stories, the jury decided that the agent's story was more credible. The Court cannot disturb that determination. *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (explaining that, in reviewing a Rule 29 motion, a district court must "defer to the credibility determination of the jury" (internal quotation marks omitted)).

Even if the Government's evidence of law enforcement's instruction to Mei is credited, Han claims that Mei never expressly informed Han that the money was drug proceeds. However, a representation "encompasses a broader range of communication than specific statements." *United States v. Kaufmann*, 985 F.2d 884, 892 (7th Cir. 1993). "It is enough that the government prove that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds." *Id.* at 893. As discussed above, during the June 4, 2018 meeting, Mei discussed in some depth his (pretend) drug dealing activities and therefore the jury could infer that Han knew that the large quantities of cash he received from Mei were drug proceeds.

The Court thus concludes that the jury had sufficient evidence from which to find that Han's June 4, 2018 transaction with Mei involved property represented to be the proceeds of unlawful activity and that Han believed the property to be such proceeds. Moreover, the circumstances of the transaction provided probative evidence of Han's intent to conceal or disguise the nature or source of that property. Indeed, the jury heard audio from that meeting evidencing Han's efforts to ensure the secrecy of the transaction—as he sought to conduct the transaction in a location where it would not look suspicious or draw attention and expressed fear of being followed. Therefore, the jury had sufficient evidence to convict Han under § 1956(a)(3)(B) and Han is not entitled to a judgment of acquittal as to Count III.

### D.     Count IV

The fourth and final count of the Second Superseding Indictment charges Han with operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a). Under the statute, "money transmitting" refers to the "transferring of funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad

by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2). In requiring that the transmission be on behalf of the public, the statute requires only that it "occur within a transactional, business dealing or for a member of the broader community rather than within a personal or close relationship." *United States v. Singh*, 995 F.3d 1069, 1077–78 (9th Cir. 2021) (internal quotation marks omitted). Courts have understood a money transmitting business to be one that "receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates." *Id.* at 1077. And the Seventh Circuit has held that the Government need not prove that "a defendant was aware of state licensing requirements or that he knew about the federal registration requirements." *United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008).

In this case, the evidence was sufficient for the jury to conclude that Han was running an unlicensed money transmitting business. As Mei testified, on multiple occasions, Han picked up large quantities of cash in Chicago and then transferred that cash to bank accounts in China. Han and Mei had no personal relationship. Similarly, Roman testified that he provided Han with large amounts of cash that eventually made its way back to Mexico. The trial record also contained evidence that Han arranged similar pickups with certain unidentified individuals and made transfers for others. And the Government introduced testimony demonstrating that Han lacked the licensure necessary to operate a money transmitting business. Finally, the Government introduced evidence showing that Han discussed charging a 1% fee in connection with a transaction with an unidentified customer. The jury could easily infer that Han charged similar fees for all his transactions, as it was improbable that he was transferring strangers' money for free. Thus, the jury had sufficient evidence to convict Han on Count IV.

Because there was sufficient evidence supporting each of the four counts of conviction, Han's motion for judgment of acquittal is denied.

## II.     Motion for a New Trial

Federal Rule of Criminal Procedure 33 allows a court to vacate a judgment and grant a new trial "if the interest of justice so requires." The "interest of justice" may require a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during the trial." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018) (internal quotation marks omitted). Nonetheless, the power to overturn a jury verdict is one "reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (internal quotation marks omitted).

### A.     Denial of Motion to Suppress

Prior to trial, Han filed a motion to suppress evidence discovered during the search of his residence conducted after Han's arrest following his meeting with Roman on November 10, 2017. This Court held an evidentiary hearing on Han's motion and ultimately denied it. Han contends that the Court erred in denying his motion to suppress, largely incorporating the arguments he previously offered in support of the motion.

The Government claims that the search of Han's residence did not violate the Fourth Amendment because Han consented to the search. Moreover, when law enforcement officers arrived at his home, they were met by Han's wife who also gave consent for the search. Han denies that either he or his wife consented to the search. In denying the motion to suppress, the Court agreed that the Government failed to establish that Han consented to the search but nonetheless concluded that the preponderance of the evidence established that consent was given by Han's wife. In considering the same arguments in connection with the present motion, the

17

Court reaches the same conclusion. In sum, Han offers no new reasons to reconsider the prior ruling and the Court does not believe that decision was mistaken.

### B.     Admission of Expert Testimony

In advance of trial, the Government proffered Internal Revenue Service ("IRS") Special Agent Ryan Talbot as an expert witness. Talbot worked at an IRS—Criminal Investigation field office and was assigned to a DEA Financial Investigation Group. The Government offered him as an expert to testify regarding the nature and operations of drug trafficking organizations and MLOs, as well as practices MLOs use to avoid detection and safekeep narcotics. Han moved *in limine* to bar Talbot's testimony, a motion that the Court granted in part and denied in part. Specifically, the Court determined that Talbot possessed the knowledge and experience to testify about the proffered topics and permitted him to provide an overview of the nature and operations of drug trafficking organizations and MLOs. Nonetheless, the Court restricted Talbot from testifying about certain topics that it found too far removed from Han's alleged conduct.

Han now contends that the Court erred in declining to bar Talbot's expert testimony completely. He claims that Talbot's testimony regarding the role played by alleged money couriers like Han in sending U.S.-generated narcotics proceeds to drug cartels in Mexico had no basis in the evidence. The Court disagrees. As discussed above, the jury heard evidence that Roman, a drug dealer, contacted Han for the purpose of sending drug proceeds back to Roman's suppliers in Mexico and that the money Roman gave to Han did make it to his suppliers. Further, the jury heard Mei testify that he picked up the proceeds generated by Mexico-supplied drugs and contacted Han to transfer those funds overseas. Such testimony demonstrated that Han's conduct was consistent with the process described by Talbot, and therefore the jury may properly have found Talbot's testimony helpful in understanding the evidence.

Following the Court's pretrial ruling, Han learned that the Government intended to elicit testimony from Talbot on a topic Han claimed had not previously been disclosed—the "currency swap" money laundering technique. Thus, Han filed a motion to bar Talbot from offering testimony on currency swaps. The Court allowed *voir dire* of Talbot prior to his testimony and heard oral argument on Han's second motion. The Court then concluded that Talbot was qualified to testify about currency swaps as a money laundering technique, there was sufficient basis for him to do so, and the testimony was sufficiently disclosed to Han.

Han argues that the Court was wrong to allow Talbot to testify regarding currency swaps because the only evidence the jury heard regarding foreign currencies related to Chinese currency and Talbot had no experience with Asia or organized crime in Asia. However, as the Court explained in permitting Talbot to testify regarding currency swaps, that objection implicates the weight, not the admissibility, of Talbot's testimony. In any case, Talbot's testimony as to currency swaps was limited to five high-level questions about the practice, and therefore even if allowing that testimony were erroneous, it is unlikely that any error affected the jury's verdict.

### C.  Han's June 2018 Post-Arrest Statements

After Han's arrest on June 4, 2018, following his meeting with Mei, law enforcement officers heard Han say: "I'm fucked, I'm fucked. I'm screwed. Just kill me now" and "I'm so screwed. It's over." Han moved *in limine* to exclude those statements but the Court found the statements admissible as non-hearsay statements of a party-opponent and probative evidence of Han's consciousness of guilt. Once again, Han reasserts the same arguments he originally offered for excluding the statements. The Court, however, finds no error. Han also argues that the statements should not have been admitted because they were never memorialized. But while the lack of a contemporaneous audio or video recording of Han's statements might have provided a

19

reason for the jury not to believe that Han actually made the statements, it was not a basis for exclusion of the testimony.

### D.  Han's Personal Income Tax Returns

The Government moved *in limine* for admission of Han's personal income tax returns for the years 2012 through 2016. In granting the admission of the tax returns, the Court found that the returns were relevant because they revealed that Han's income over the five-year period was inconsistent with the Government's discovery of $1.3 million at his residence. To the extent that the tax return evidence suggested that Han submitted false tax returns and thus presented a Federal Rule of Evidence 404(b) issue, the Court nonetheless found the returns to be admissible under the Rule to show Han's knowledge or intent concerning his money laundering activities. Han offers the Court no new reason to revisit its admission of the tax return evidence. Moreover, any error would not have been prejudicial, as the Court allowed Han to introduce the tax returns for his electronics business, which reflected millions of dollars in revenue reported to the IRS.

### E.  Roman's Testimony

Han highlights three errors supposedly committed in connection with Roman's testimony. First, the jury heard Roman testify that the money he provided to Han was returned to Mexico. Han argues that his objections to this testimony should have been sustained, as the testimony lacked foundation and was speculative. The Court disagrees.

First, there was sufficient foundation for the evidence in that Roman testified that he arranged to send his drug proceeds to his supplier by communicating with Tio, who used a Mexico-based phone number and put Roman in touch with Han. Moreover, Roman testified that he received his drugs on consignment and therefore if the money did not make it back to Roman's supplier, the deliveries would have stopped. Indeed, on the one or two occasions when Roman's

delivery of money was short, Tio required him to make up the difference. Any weaknesses in Roman's testimony were best explored on cross-examination.

Second, Han argues that he was denied the opportunity to fully cross-examine Roman regarding his communications with the Government before trial, which violated his Sixth Amendment right to present a complete defense. During cross-examination, Roman testified that, in his discussions with the prosecution before trial, he informed them that he started selling bulk narcotics in July 2017 whereas he previously testified before the grand jury that he began making those sales in April or May of 2017. Han therefore sought to question Roman about how the prosecutors responded to that inconsistency, but the Court precluded him from doing so. As the Court stated on the record, to the extent the discrepancy in his testimony undermined Roman's credibility, Han had a sufficient opportunity to develop the record on that point and to argue that Roman had changed his story. The Government's reaction to the discrepancy, however, had minimal probative value and thus the Court fails to see how precluding Han from further exploring the issue violated his Sixth Amendment rights.

Finally, during Roman's direct examination, he testified that during one of his meetings with Han, he observed Han speaking on the phone in an "Asian dialect" to an unidentified individual calling from a Mexico-based phone number. When Han's counsel cross-examined Roman regarding that call, he attempted to ask Roman whether he could rule out that Han was discussing his electronics business. The Government objected and the Court sustained the objection, as it found that Roman had no basis to testify about the substance of the conversation since he did not understand the language in which Han was speaking and so any such testimony would be pure speculation. In challenging the Court's ruling, Han still cannot explain how Roman

could have provided any insight into a conversation held in an unfamiliar language. Accordingly, the Court finds no error in excluding the testimony.

### F. Evidence of Flight

The Court granted the Government's motion *in limine* seeking admission of evidence of Han's flight upon seeing law enforcement officers approach his residence on June 25, 2018. According to Han, he did not actually flee since he simply retreated from an exterior room of his house to an interior room. The Court disagrees. The jury heard testimony that Han was observed inside his home while officers knocked for three minutes. Then, after the officers forcibly entered his home, Han ran into a bedroom inside the house. That all relevant events occurred entirely inside Han's home does not mean that Han's conduct did not constitute flight. *See United States v. Baker*, No. 08 CR 1053, 2010 WL 3173036, at *2 (N.D. Ill. Aug. 9, 2010) ("A failure to surrender may raise an inference of consciousness of guilt.").

### G. Coconspirator Statements

Han also contends that this Court erred by finding that the Government demonstrated Han's participation in a single conspiracy and, on that basis, admitting certain coconspirator statements. Under Federal Rule of Evidence 801(d)(2)(E), statements made by a party's coconspirator during and in furtherance of the conspiracy are not hearsay when offered against an opposing party. In *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the Seventh Circuit held that "when a statement of a coconspirator which would otherwise be regarded as hearsay is proffered by the Government, [Federal Rule of Evidence 104(a)] requires that the district court make a preliminary determination regarding the admissibility of the declaration of the coconspirator." *United States v. Rodriguez*, 975 F.2d 404, 405 (7th Cir. 1992).

Before Han's trial, the Government submitted its *Santiago* proffer, which claimed that the evidence would show that Han was part of a money-laundering conspiracy involving Roman, Mei, and other unidentified individuals. Han's role in the conspiracy was to collect narcotics proceeds from individuals in Chicago and then launder those proceeds to Mexico-based drug traffickers. This Court determined that the Government's submission sufficiently showed the existence of a conspiracy and that Han was a participant in that conspiracy. Han now contends that the evidence at trial failed to prove that Han's activities were part of a single conspiracy to launder Mexican drug cartel money. But, as discussed above, the Court finds that there was sufficient evidence for a jury to find that Han was a participant in a single money laundering conspiracy. Accordingly, his coconspirator's statements were properly admitted.[1]

### H.     Evidence from Roman and Mei's Phones

Among the evidence considered by the jury were photographs of texts or other electronic communications taken from Roman's phone and from Mei's phone. Han argues that the Government failed to provide adequate foundation for the admission of the communications from Roman's and Mei's phones. He further contends that admission of photographs of phone communications presents a "best evidence" issue under Federal Rule of Evidence 1002.

The Court is satisfied that proper foundation was laid for the admission of the photographs of communications taken from Roman's and Mei's phones. The law enforcement officers involved with the investigation testified about the steps they took to recover and photograph the contents of the phones, and both Roman and Mei affirmed that the photographs accurately represented materials taken from their phones. As to the best evidence issue, Rule 1002 calls for

---

[1] Han also raises other challenges based on the supposed insufficiency of the *Santiago* proffer, attacking the admission of Mei's testimony as evidence of the alleged conspiracy and the Court's denial of Han's motion for a mistrial for failure to prove a single conspiracy. Those related challenges similarly fail given that there was sufficient evidence of Han's participation in a single conspiracy.

an original writing, recording, or photograph but Federal Rule of Evidence 1003 allows for the admission of a duplicate so long as no genuine question is raised about the original's authenticity. Given the testimony from Roman and Mei, there are no concerns as to the authenticity of the phone evidence. Accordingly, the Court finds the evidence properly admitted.

### I.      Han's Wife's Reaction to the Search

During the search of Han's residence on November 10, 2017, one law enforcement officer testified about his observation of Han's wife's physical reaction upon the officers' discovery of cash hidden in the basement. The Court allowed the officer to testify only to his observation of Han's wife's demeanor but excluded testimony as to what his wife actually said. Yet Han claims that even this limited testimony was improper.

Han first asserts that evidence of his wife's reaction had limited relevance that was outweighed by the risk of undue prejudice. But there was no problem in allowing the officer to testify about his own observations of another person's demeanor. Moreover, Han's wife's demeanor had probative value, as the jury might reasonably infer that had the cash discovered in the basement been legitimate, Han's wife would not be surprised to see it. Because the officer was not permitted to testify as to any statements made by Han's wife or speculate as to her state of mind, the job of interpreting the reaction was properly left to the jury. While Han suggests that even nonverbal conduct raises a hearsay problem, that is only where the person intends their nonverbal conduct as an assertion. Fed. R. Evid. 801(a). A surprised expression, by itself, conveys no assertion.

### J.      Evidence of Han's Wife's Mercedes

The Court allowed the Government to introduce evidence concerning Han's wife's purchase of a $62,000 Mercedes vehicle in July 2016 that she was able to pay off by January

2017. According to Han, that evidence had no connection to Han's wrongdoing and served only to prejudice the jury against him. However, the ability of Han's wife to purchase and quickly pay for an expensive vehicle is probative evidence suggesting that Han was earning income outside of his electronics business, given that the Mercedes cost almost three times more than what Han reported earning in his 2016 tax return.

Han further asserts that the evidence should not have been admitted because it invited the jury to draw inferences unsupported by the evidence—namely, that his wife did not have some other source of legitimate income to use for the purchase. But the Government's evidence regarding Han's tax returns revealed that he and his wife filed jointly. Finally, Han argues that the evidence of the Mercedes constitutes inadmissible bad acts evidence under Rule 404(b). As with the tax returns, however, Han's wife's purchase of the Mercedes is admissible for non-propensity purposes—that is, to show that Han had some other illegitimate form of income. *See United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir. 1990) ("It is well settled that in narcotics prosecutions, a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income . . . .").

### K. Communications From Han's Phone

The Government introduced evidence taken from several phones seized from Han. That evidence included multiple communications by Han with unidentified individuals and tended to corroborate various portions of Roman's and Mei's testimony. For example, the communications showed Han setting up meetings in parking lots, sending alphanumeric codes consistent with dollar bill serial numbers, and using the same code name, "Sam," that he used in his

communications with Roman. And one of Han's communications was with a person who referred to himself as "the man you call from Mexico" and discussed the "box" he had dropped for Han.

Han argues in a conclusory manner that the Government failed to lay proper foundation for the admission of the communications or establish that they were collected in a forensically reliable manner. However, a forensic analyst testified in sufficient detail as to the procedures she employed to extract and document the evidence from Han's phones. In addition, Han baselessly claims that the communications are inadmissible hearsay even though his statements qualified as non-hearsay statements of a party-opponent. Finally, Han's communications are not inadmissible evidence of prior bad acts under Rule 404(b) because they were offered as direct and relevant evidence of the charged conspiracy. *United States v. Elmer*, 980 F.3d 1171, 1175 (7th Cir. 2020) ("[E]vidence directly pertaining to the defendant's role in a charged conspiracy is not excluded by Rule 404(b)." (internal quotation marks omitted)).

Relatedly, Han claims that the Court erred in allowing a DEA agent involved in the investigation to testify regarding the communications. But Han's arguments concerning the agent's testimony simply implicate the weight of the evidence rather than its admissibility. Accordingly, Han was permitted to and did extensively cross-examine the agent to draw out the supposed deficiencies in his testimony and the communications evidence. That the jury may have nonetheless credited the evidence does not entitle Han to a new trial.[2]

### L.    Money Service Business Registration Form

To show that Han had not registered a money transmitting business, the Government called a witness from the U.S. Department of the Treasury's Financial Crimes Enforcement

---

[2] Han also claims that the Court erred in denying his motion for a mistrial insofar as it was predicated on the admission of Han's communications with unidentified individuals and testimony regarding those communications. Since the Court committed no error with respect to the evidence, Han's motion for a mistrial was properly denied.

Network ("FinCEN"). As part of its examination of the FinCEN witness, the Government introduced into evidence a blank Form 107, which is a registration form for money service businesses. The witness went on to testify that he had conducted a search of FinCEN's databases and found no completed Form 107 for Han, his wife, or Han's companies. Han suggests that the introduction of the Form 107 was unfairly prejudicial because it implied that Han was required to fill out that form. The Court disagrees. The witness testified only that individuals and businesses that qualified as money service businesses had to fill out the Form 107 and stated that there was no record of Han ever completing that form. Such information was relevant to one element of Count IV. But nothing about the FinCEN witness's testimony had the effect of suggesting an answer to the question of whether Han was, in fact, operating a money transmitting business.

### M.  Mei's Testimony Regarding Han's Threats

Han claims that Mei improperly was permitted to testify that Han threatened him prior to the June 4, 2018 meeting. According to Han, Mei's testimony regarding his threats constituted other bad acts evidence that should have been excluded under Rule 404(b). But, as discussed above, the Court does not believe that Han's threatening texts to Mei and Mei's testimony regarding those texts were unrelated to the charged criminal conduct. Rather, Han's threatening communications to Mei were relevant and probative evidence reflecting Han's knowledge that the funds he expected Mei to deliver to him were the proceeds of some unlawful activity.

### N.  Translation of Mei's Testimony

Because Han's native language is Mandarin, the Court made available to Han an English-to-Mandarin interpreter. Yet an issue arose with respect to Mei's testimony, which was given in Cantonese. Unfortunately, no interpreter appropriately credentialed to provide direct Mandarin-to-Cantonese interpretation services was available. Upon review of the Guide to Judiciary Policy,

Volume 5: Court Interpreting and after consulting with the Official Court Interpreter, the Court determined and advised the parties that, in such circumstances, the relay method of interpretation, whereby the Cantonese testimony would be translated into English and then a Mandarin interpreter would translate the English into Mandarin, is a recognized interpretation mode. Han was not satisfied with the proposal to utilize relay interpretation and therefore opted to hear Mei's testimony only in Cantonese and English.

There is no doubt that "[a] criminal defendant is denied due process when he is unable to understand the proceedings due to a language difficulty." *Mendoza v. United States*, 755 F.3d 821, 827 (7th Cir. 2014). But here, the record contains no indication that Han had any difficulties understanding the proceedings in English; to the contrary, Han elected not to use the English-to-Mandarin interpreters who were present in the courtroom and available to him for the duration of the trial.[3] It was only when Mei was called to testify that Han indicated that it was insufficient for him to listen to testimony in English rather than Mandarin. Given that the record demonstrates that Han was able to understand the proceedings in English, there was no due process violation caused by the Court's inability to provide an interpreter that could translate Mei's Cantonese testimony directly into Mandarin. *See United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985) (finding no due process violation from the lack of an interpreter where the Court observed

---

[3] Two English-to-Mandarin interpreters were in the courtroom for the duration of the trial so that Han would be able to receive simultaneous interpretation of the English-language proceedings (or consecutive interpretation, if he preferred it). At the beginning of the trial, Han confirmed in open court after consultation with his attorney that *he* had decided to proceed with the interpreters assisting him on a stand-by basis only. Specifically, Han informed the Court that he would prefer to hear trial testimony in English and that if any point he had difficulty understanding the proceedings on his own, he would raise his hand to receive assistance from the interpreters. At the conclusion of a detailed discussion on the record of the procedures to be followed, the Court expressly confirmed the arrangements as follows: "Mr. Han, it's very important for you to be comfortable that you understand everything that occurs during the trial, in particular, the testimony that's given. That's the only way to make sure that you have a fair trial and that you're able to help your lawyers with your defense. So if you have any doubts or concerns, please do not hesitate to raise your hand or otherwise get my attention so that the interpreters can help you. Will you do that?" To which Han responded, "Yes, Judge. Thank you." Han then proceeded to rely on his own English language skills for the duration of the trial.

that the defendant rarely used an interpreter during his extensive testimony given in connection with a hearing on his English-speaking abilities).

In any case, Han never adequately explains why the lack of a direct Cantonese-to-Mandarin interpretation made the proceedings fundamentally unfair. *See United States v. Garcia*, 948 F.3d 789, 802 (7th Cir. 2020) ("The basic constitutional inquiry when determining the competency of interpretation is whether any inadequacy in the interpretation made the trial fundamentally unfair." (internal quotation marks omitted)). Nor does he demonstrate that the Court's relay interpretation proposal was constitutionally inadequate. On the contrary, "[a]n interpretation need not be verbatim to be constitutionally sound if it reasonably conveys the intent or the idea of the thought spoken." *Id.* at 802 (internal quotation marks omitted). Han offers the Court no basis to conclude that the relay method—a mode of interpretation consistent with judicial policy guidance—would not have accomplished that task. Thus, Han cannot show that he suffered a due process violation when he had available to him but declined a constitutionally acceptable method of translating Mei's testimony from Cantonese to Mandarin.

Han also challenges this Court's handling of a potential interpretation error that occurred in translating Mei's testimony from Cantonese into English. At the end of Mei's first day of testimony, the Cantonese-language interpreter informed the Court that he may have made a translation error. Specifically, during cross-examination, Mei was asked whether he believed that it was legal to wire a large sum of money to China. The interpreter heard Mei testify that Mei understood it was "illegal" to make such a transfer but had observed the word "legal" appear in the court reporter's real-time version of the transcript, thus causing the interpreter to worry that he had misinterpreted the testimony. The next day, the Court informed the parties that it had reviewed the trial transcript and the audio of the proceedings in chambers and determined that the

interpreter had used the English word "illegal" but the Court reporter had mistakenly heard "legal" and transcribed the testimony accordingly. To ensure that the parties were fully advised of the situation, the Court then played the disputed testimony and translation for the parties.

Han now argues that it was improper for the Court to review the disputed translation outside of the parties' presence and then refuse to play the disputed testimony for the interpreter. But as noted above, Han is mistaken in suggesting that the parties and the interpreter were not fully involved in resolving the potential interpretation issue. Contrary to Han's assertion, the Court *did* play the disputed audio for the parties and the Cantonese interpreter, and Han's counsel agreed that the interpreter said "*il*legal" rather than "legal." Nonetheless, to eliminate any doubt as to the intended testimony from the witness, the Court allowed the Government to clarify the testimony on re-direct examination, at which time Mei confirmed that he understood that the referenced transfers were illegal. The Court sees no error in how it handled the transcription error, and it ultimately caused no prejudice to Han. With respect to the potential for prejudice, Han provides no reason why the handling of the translation of his one word would have constituted anything other than harmless error.

### O.     Mei's Testimony as to the Origins of the Drug Proceeds

The Government elicited testimony from Mei as to the statement of a coconspirator, "Sasa," who told Mei that the money he picked up came from the sale of drugs supplied by Mexicans. Han objected to the testimony for lack of foundation but the Court overruled the objection, explaining that Mei would be permitted to testify as to his own understanding of where the money was coming from. Once again, Han asserts that Mei should not have been permitted to testify that he was told that he was picking up Mexican drug proceeds.

The Court finds no error with the admission of Mei's testimony tying the money he picked up to drugs from Mexico. As Mei testified, he was told about the origin of the drugs by the individual who was directing him to pick up the cash. Moreover, the testimony presents no hearsay issue, as the statement was made by a coconspirator in furtherance of the conspiracy. Any weaknesses as to Mei's testimony regarding the drug's origins was a matter for cross-examination rather than exclusion.

### P.    Jury Note Regarding Count IV

During deliberations, the Court received a note from the jury with a question as to Count IV. In particular, the jury asked whether a person can be guilty of operating an unlicensed money transmitting business if he was not aware of the registration requirement. After discussing the note with the parties, the Court opted to respond to the jury as follows:

> For purposes of Element No. 4 of Count Four, the government does not need to prove that the defendant was aware of the registration requirements for money transmitting businesses. But the government must prove beyond a reasonable doubt that the defendant knew his alleged money transmitting business was not registered with the Secretary of the Treasury.

Han argues that it was improper and prejudicial for the Court to provide such a response.

"A district court's discretion in deciding how to respond to a jury question is quite broad, but the court has an obligation to exercise that discretion in a way that dispels any confusion quickly and with concrete accuracy." *United States v. Durham*, 645 F.3d 883, 893 (7th Cir. 2011) (internal quotation marks omitted). Here, the Court's response and supplemental instruction was indisputably an accurate statement of the law. *Dimitrov*, 546 F.3d at 413. Moreover, the response recognized that the jury had some confusion with respect to the original instruction, which did not address whether a defendant must have knowledge regarding the registration requirements and gave a concise response clarifying the issue.

31

Han contends that the Court's response to the note should have reinstructed the jury as to all of the elements of Count IV. But again, the Court has "discretion on both whether and how to answer a jury's question." *United States v. Protho*, 41 F.4th 812, 831 (7th Cir. 2022). Thus, the Court determined that limiting its response solely to the issue causing the jury difficulty was appropriate. On the other hand, reinstructing the jury as to elements about which the jury did not ask would have risked diminishing the clarity and effectiveness of the Court's response. Consequently, Han fails to convince the Court that it committed an error either in deciding to respond to the jury's note or in the substance of its response.

## Q.     Jury Instructions

Although Han claims that the Court made more than a dozen errors related to its jury instructions, his motion for a new trial contains substantive argument as to only two of those purported errors. First, Han argues that the Court erred by failing to provide the jury with a duress instruction. Han asserts that a duress instruction was appropriate and necessary in light of evidence that Han told Mei that Han's "boss" had subjected him to violence and also threatened to harm his wife and child.

Duress is an affirmative defense that "excuses criminal conduct, even though the defendant engages in it with the requisite *mens rea*, because the defendant nevertheless acted under a threat of a greater immediate harm that could only be avoided by committing the crime charged." *United States v. Sawyer*, 558 F.3d 705, 710–11 (7th Cir. 2009). To show duress, a defendant must establish that: (1) he reasonably feared immediate death or serious bodily harm unless he committed the offense; and (2) there was no reasonable opportunity to refuse to commit the offense and avoid the threatened injury. *Id.* Before a jury will receive an instruction on duress, a defendant must show "a foundation for the elements of the defense in the evidence." *Id.*

Here, the Court concludes that Han's statements to Mei failed to establish a basis for providing a duress instruction to the jury. Nothing in Han's statements revealed that he faced a real and imminent threat of harm. At best, Han's statements represent the type of generalized fear that an individual might face when working for a large criminal operation. Further, the record contained no evidence whatsoever suggesting that Han lacked a reasonable opportunity to ensure his and his family's safety by getting out of the money laundering business. Accordingly, the Court appropriately rejected Han's requested duress jury instruction.

Next, Han faults the Court for failing to instruct the jury that, to convict Han on Count II for attempted money laundering by concealment, the money provided by Roman to Han had to be the actual proceeds of an unlawful activity. But, as discussed above, given that the Government proceeded only on an attempt theory in Count II, it was enough that Han believed that he was dealing with the actual proceeds of an unlawful activity even though the money was, in fact, lookalike currency. Therefore, Han's requested instruction would not be a proper statement of the law as to the offense of attempted money laundering by concealment.

Han's remaining challenges to the jury instructions simply claim that the Court erred by not accepting certain of Han's proposed instructions or by overruling Han's objections to several of the Government's proposed instructions.[4] The Court rejects most of these challenges based on the fact that Han develops no substantive argument beyond directing the Court back to the arguments he made during the instruction conference. *See United States v. Black*, No. 18 CR 149-

---

[4] At one point, Han's motion includes a paragraph making conclusory arguments that the Court erred in overruling his objections as to thirteen jury instructions. Then, the next paragraph confusingly makes essentially the same conclusory arguments as to the same list of thirteen jury instructions. The Court assumes that this was a proofing error; if not, the perfunctory and cursory nature of Han's arguments makes it impossible for the Court to discern any new argument in the second paragraph distinct from those in the first paragraph.

3, 2021 WL 4894702, at *4 (N.D. Ill. Oct. 20, 2021) ("[The defendant] asserts that the Court erred in denying his oral motions and objections made prior and during trial. Again, [the defendant] does not explain why or how the Court erred when making its rulings, and thus has waived these claims.").

In those instances where the jury was not provided with Han's preferred instruction, the Court nonetheless finds that it did not commit an error warranting a new trial. The Court accurately instructed the jury as to the law and, in most cases, Han's objections correspond to various substantive challenges that the Court rejected in denying his motion for judgment of acquittal. Other challenges simply took issue with the wording of a certain instructions and do not provide a basis for a new trial. *United States v. Garrett*, 757 F.3d 560, 570 (7th Cir. 2014) ("[T]he district court is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law." (internal quotation marks omitted)).

Finally, Han's failure to develop most of his claims of error as to the jury instructions is fatal because "to receive a new trial based on erroneous instructions, a defendant must show both that the instructions did not adequately state the law and that the error was prejudicial to him because the jury was likely to be confused or misled." *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (internal quotation marks omitted). Yet Han provides no explanation as to how any error prejudiced him. In short, Han is not entitled to a new trial due to erroneous jury instructions because he cannot specifically identify any instruction that misstates the law and he does not even attempt to show prejudice.

### R.     Mistrial Based on the Government's Closing Argument

In its rebuttal closing argument, the Government addressed the texts that Han exchanged with unidentified individuals. The Government claimed that the texts revealed that Han was arranging meetings with strangers that resembled the meetings he had arranged with Roman and Mei. At one point, the Government argued as follows: "Now you heard defense counsel talking about the phone evidence and how [a DEA witness] wasn't able to identify every person in those text messages that was put forward, but neither was [Han]. [Han] can't tell you who those people were because they were strangers. [Han] was making arrangements with strangers to meet in parking lots."

Han argues that this portion of the Government's closing argument improperly suggested to the jury that Han had the burden to prove the identity of the individuals with whom he was messaging. Further, Han asserts that the Government's argument also amounted to a commentary on Han's decision not to testify. The Court disagrees. As an initial matter, the Government emphasized in its closing argument that the burden of proof lay solely with the Government and that Han had no burden. (This was consistent with instructions from the Court that the jury heard multiple times during the trial, from *voir dire* to closing instructions.) Moreover, the Government was not commenting on Han's failure to present proof as to the identities of the people he texted or his choice not to testify. Instead, it was responding to Han's attack on the weight of the text message evidence by noting that the record contained no suggestion that the individuals were anything but strangers to Han. The Court does not believe that this portion of the Government's closing was inappropriate or otherwise warrants taking the drastic measure of ordering a new trial.

### S.    Forfeiture

Finally, Han challenges the jury's special verdict as to forfeiture. After the jury returned its verdict finding Han guilty on all four counts, the parties argued forfeiture to the jury. The jury then returned a forfeiture verdict finding that all of the charged property was forfeitable save for one of the firearm's recovered at Han's residence. Now, Han contends that the Government failed to sufficiently prove a connection between several of the forfeited items and Han's criminal conduct.

Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture. When the Government seeks criminal forfeiture, it has the burden of proving that the property is subject to forfeiture by a preponderance of the evidence. *United States v. DelGuidice*, No. 20 CR 111-1, 2022 WL 1025931, at *2 (N.D. Ill. Mar. 28, 2022). "In order to meet its burden, the Government must establish a nexus between the property seeking to be forfeited and the offense." *Id.* Proving such a nexus requires the Government to establish "that the property sought to be forfeited bears more than an incidental or fortuitous connection to the criminal activity." *Id.*

Here, there was sufficient evidence supporting the jury's forfeiture verdict. Among the forfeited property were large quantities of cash that law enforcement officers discovered in Han's residence and in his car. Given the evidence of Han's money laundering activities and the fact that the large amounts of cash were inconsistent with Han's reported income from his legitimate business, there was sufficient proof for the jury to believe that the cash was connected to Han's money laundering activities. Also subject to forfeiture were firearms recovered from Han's residence. Those firearms were properly subject to forfeiture given that they were found in close

proximity to large amounts of cash in Han's basement, thus supporting a reasonable inference that Han used the firearms to protect the illegal proceeds. Finally, Han challenges the forfeiture of his wife's Mercedes. However, because the price of the vehicle was inconsistent with Han's earnings from his legitimate business, the jury could reasonably conclude that the vehicle was purchased with money Han derived from money laundering.[5]

## CONCLUSION

For the foregoing reasons, Han's motions for a judgment of acquittal (Dkt. No. 235) and for a new trial (Dkt. No. 234) are denied.

ENTERED:

Dated:  October 26, 2022

_____
Andrea R. Wood
United States District Judge

---

[5] Han also argues that he is entitled to a judgment of acquittal on the issue of forfeiture. Having concluded that the jury had sufficient evidence for its forfeiture verdict, Han is not entitled to acquittal on forfeiture.